Slip Op. 26-139

UNITED STATES COURT OF INTERNATIONAL TRADE

**KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.,**

**Plaintiff,**

**and**

**ÇOLAKOĞLU METALURJI A.Ş. and ÇOLAKOĞLU DIŞ TICARET A.Ş.,**

**Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**REBAR TRADE ACTION COALITION,**

**Defendant-Intervenor.**

**Before: Gary S. Katzmann, Judge**
**Court No. 25-00225**

## OPINION

[ Plaintiff and Plaintiff-Intervenors' Motions for Judgment on the Agency Record are denied. ]

Dated: November 16, 2026

Daniel L. Delnero, BGD Legal & Consulting LLC, of Atlanta GA, argued for Plaintiff Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.

Jessica R. DiPietro, Matthew M. Nolan, and Tyler J. Kimberly, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenors Çolakoğlu Metalurjı A.Ş. and Çolakoğlu Dış Ticaret A.Ş.

Natalee A. Allenbaugh, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the briefs were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, Franklin E. White, Jr., Assistant Director. Of counsel on the briefs was Heather Holman, Attorney,

Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Maureen E. Thorston, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Rebar Trade Action Coalition. With her on the brief were Alan H. Price, John R. Shane, Stephanie M. Bell, and Stephan A. Morrison.

Katzmann, Judge: This case inspires a feeling of déjà vu. For a fifth time, Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan")[1], a Turkish producer of rebar,[2] challenges an administrative review by the Department of Commerce ("Commerce") of the countervailing duty order on Turkish rebar. Pl.'s Mot. for J. on the Agency R. and Accompanying Mem. of Points and Authorities Pursuant to Rule 56.2 at 2–3, May 4, 2026, ECF No. 43 ("Pl.'s Br."); see Steel Concrete Reinforcing Bar from the Republic of Turkiye: Final Results of Countervailing Duty Administrative Review; 2022, 90 Fed. Reg. 44167, 44168 (Dep't Com. Sep. 12, 2025), P.R. 291 ("Final Results").[3] And for a third time, Kaptan specifically contests Commerce's determination to value a rent-free lease of land using a report prepared by Colliers International ("Colliers")

---

[1] To ensure internal consistency and compatibility with future publication formats, the court represents Turkish language proper names without diacritics.

[2] "Rebar is a long-rolled steel product commonly used in construction projects to provide strength to concrete." Steel Concrete Reinforcing Bar from Mexico and Turkey at 7, Inv. Nos. 701-TA-502 and 731-TA-1227 (Second Review), USITC Pub. 5722 (Apr. 2026).

[3] Kaptan challenged four prior administrative reviews of the countervailing duty order on Turkish rebar. See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 159 F.4th 1334 (Fed. Cir. 2025) ("Kaptan I") (2018 administrative review); Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, No. 22-00149 (U.S. Ct. Int'l Trade filed May 12, 2022) ("Kaptan II") (2019 administrative review); Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 49 CIT __, 803 F. Supp. 3d 1276 (2025) ("Kaptan III") (2020 administrative review); Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 49 CIT __, 803 F. Supp. 3d 1291 (2025) ("Kaptan IV") (2021 administrative review). Kaptan II and Kaptan IV are presently before the court following remand in each case. See Order, Kaptan II, Feb. 12, 2026, ECF No. 70 (granting the Government's unopposed motion for voluntary remand); Kaptan IV, 803 F. Supp. 3d at 1296. Kaptan III has been appealed to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, No. 26-1229 (Fed. Cir. appeal docketed Dec. 9, 2025).

rather than a competing report prepared by Cushman & Wakefield ("C&W"). See Pl.'s Br. at 1–2; Kaptan III, 803 F. Supp. 3d at 1290; Kaptan IV, 803 F. Supp. 3d at 1304.

The court holds Commerce's selection of a land valuation benchmark to be supported by substantial evidence. The court accordingly denies Kaptan's motion for judgment on the agency record. The court also denies a related motion for judgment on the agency record brought by Plaintiff-Intervenors Colakoglu Metalurji A.S. and Colakoglu Dis Ticaret A.S.'s (collectively, "Colakoglu"). See Pl.-Inters.' Mot. for J. on the Agency R. Pursuant to Rule 56.2 of the Rules of the U.S. Ct. of Int'l Trade at 1, May 11, 2026, ECF No. 44 ("Pl.-Inters.' Br.").[4]

## BACKGROUND

### *I. Legal Background*

The Tariff Act of 1930 provides a mechanism to level the playing field in international trade by empowering Commerce to address unfair trade practices. See LA Molisana S.p.A v. United States, 138 F.4th 1353, 1355 (Fed. Cir. 2025). One of these remedies, the imposition of a countervailing duty, is "directed towards the unfair conduct of foreign governments." Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014). Foreign governments sometimes "subsidize[] the manufacture, production, or export of . . . merchandise." Kaptan I, 159 F.4th at 1337. Such subsidies are considered "countervailable" unfair trade practices if they meet certain statutory criteria. See Gov't of Quebec v. United States, 105 F.4th 1359, 1362 (Fed. Cir. 2024) (citing 19 U.S.C. §§ 1677(5), (5A)).

If Commerce determines that a countervailable subsidy exists—and the U.S. International Trade Commission determines that a domestic industry is materially injured or is threatened with material injury by the subsidized imports—"Commerce may impose countervailing duties on the

[4] Colakoglu is a Turkish producer and exporter of rebar subject to the countervailing duty order at issue. See Pl.-Inter.'s Br. at 2.

subject imports equal to the amount of the net countervailable subsidy." Id. (citing 19 U.S.C. § 1671(a)).

Countervailable subsidies may take the form of a foreign government's provision of "goods or services . . . for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). Commerce's regulations provide a framework for assessing adequate remuneration. See Nucor Corp. v. United States, 927 F.3d 1243, 1246 (Fed. Cir. 2019) (citing 19 C.F.R. § 351.511(a)(2)). Commerce's preferred approach is to

> measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties or actual imports. In choosing such transactions or sales, [Commerce] will consider product similarity; quantities sold or imported; and other factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i).

Each year after the publication of a countervailing duty order, Commerce (upon a party's request) must "review and determine the amount of any . . . countervailable subsidy." 19 U.S.C. § 1675(a)(1). "Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014).

In countervailing duty proceedings, Commerce "obtains most of its factual information . . . from submissions made by interested parties during the course of the proceeding." 19 C.F.R. § 351.301(a). "Although Commerce has authority to place documents in the administrative record that it deems relevant, 'the burden of creating an adequate record lies with [interested parties] and not with Commerce.' " QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (alteration in original) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992)).

### *II. Factual Background*

Commerce issued a countervailing duty order on Turkish rebar in 2014. See Steel Concrete Reinforcing Bar From the Republic of Turkey: Countervailing Duty Order, 79 Fed. Reg. 65926, 65927 (Dep't Com. Nov. 6, 2014). On December 29, 2023, Commerce initiated the administrative review for the period from January 1, 2022, through December 31, 2022. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 90168, 90173 (Dep't Com. Dec. 29, 2023), P.R. 12.[5] Commerce selected Kaptan and another company, Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"), as mandatory respondents.[6] See Mem. from A. Menon to E. Eastwood, re: Respondent Selection at 1 (Dep't Com. Mar. 6, 2024), P.R. 25, C.R. 6.

In its preliminary results, Commerce found that Nur Gemicilik ve Ticaret A.S. ("Nur"), Kaptan's cross-owned affiliate, enjoyed a rent-free lease of government-owned land during the 2022 period of review. See Mem. from S. Fullerton to A. Elouaradia, re: Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkiye; 2022 at 11 (Dep't Com. Dec. 6, 2024), P.R. 240 ("Prelim. IDM"). Consistent with previous determinations, Commerce found the program to be countervailable as a "regionally specific" "financial contribution in the form of land provided for [less than adequate renumeration]." Prelim. IDM at 11–12 (citing 19 U.S.C. §§ 1677(5)(D)(iii), (5)(E)(iv), (5A)(D)(iv)).

---

[5] "P.R" and "C.R." refer to the index numbers of public and confidential documents in the amended joint appendix. See Am. Public J.A., Oct. 23, 2026, ECF No. 63; Am. Confidential J.A., Oct. 23, 2026, ECF No. 64.

[6] In antidumping duty administrative reviews, Commerce is charged with "determin[ing] the individual . . . dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1). However, where determining individual margins is "not practicable" due to the "large number of exporters" involved in the review, Commerce may limit its examination to a "reasonable number" of exporters, referred to as mandatory respondents. Id. § 1677f-1(c)(2); see also 19 C.F.R. § 351.109.

Lacking any direct valuation method for how much Nur would otherwise have paid for the rent-free land, Commerce evaluated potential benchmarks submitted by interested parties. See id. at 12. Kaptan submitted a report prepared by C&W. See Letter from D. Simon to Sec'y Com., re: Kaptan Benchmark Submission at Ex. 1 (Nov. 6, 2024), P.R. 214, C.R. 255 ("C&W Report"); see also Letter from D. Simon to Sec'y Com., re: Kaptan Benchmark Submission at Ex. 4 (Nov. 6, 2024), P.R. 217, C.R. 258 ("Engagement Agreement") (containing excerpt of the agreement between Kaptan and C&W). The Rebar Trade Action Coalition ("RTAC"), a group of domestic rebar producers that participated in the administrative review, submitted a report prepared by Colliers. Letter from Wiley Rein LLP to Sec'y Com., re: RTAC Benchmark Submission at Ex. 1 (Nov. 7, 2024), P.R. 221 ("Colliers Report"); see also Letter from Wiley Rein LLP to Sec'y Com., re: Rebar Trade Action Coalition (RTAC) Request for Review (Nov. 30, 2023), P.R. 4 (requesting administrative review). Commerce preliminarily relied on the Colliers report to "compute[] the amount Nur should have paid for its rent-free land during the [period of review]" using "rental prices from Cerkezkoy, Tekirdag." Prelim. IDM at 12.

On January 21, 2025, Kaptan submitted a case brief arguing that Commerce should use the C&W report, not the Colliers report, as a land valuation benchmark. See Letter from D. Simon to Sec'y Com., re: Kaptan's Case Brief at 8–28 (Jan. 21, 2025), P.R. 268, C.R. 284 ("Kaptan's Case Br."). In particular, Kaptan challenged Commerce's reliance on rental prices for "properties in an 'industrial zone' in Cerkezkoy, in Tekirdag province, within the 'Greater Istanbul Industrial Area,' " id. at 8, arguing that "the area in which [the properties in the Colliers report] are located is so different, geographically and economically, from the Trabzon area of Nur's property as to disqualify them as benchmarks," id. at 10. On February 3, 2025, RTAC submitted a rebuttal brief, in which it argued that Commerce should continue to use the Colliers report. See Letter from

Wiley Rein LLP to Sec'y Commerce, re: Steel Concrete Reinforcing Bar from the Republic of Turkiye: RTAC's Rebuttal Brief (Feb. 3, 2025), P.R 278; C.R 286.

In the Final Results, Commerce rejected Kaptan's arguments and continued to use the Colliers report as a benchmark to value Nur's rent-free lease. See Mem. from S. Fullerton to C. Abbott, re: Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Türkiye; 2022 at 4, 9–11 (Dep't Com. Sep. 8, 2025), P.R. 286 ("IDM"). Commerce calculated a subsidy rate of 2.06 percent for the provision of land for less than adequate renumeration. Id. at 4. Commerce applied an overall countervailing duty rate of 2.43 percent to Kaptan and assigned the same rate to Colakoglu as a non-selected respondent. See Final Results, 90 Fed. Reg. at 44168; 19 U.S.C. § 1671d(c)(5).

**PROCEDURAL HISTORY**

Kaptan initiated the instant case against Defendant the United States ("the Government") on October 10, 2025, challenging the Final Results. See Summons, Oct. 10, 2025, ECF No. 1; Compl., Oct. 11, 2025, ECF No. 8. Colakoglu intervened as Plaintiff-Intervenor. See Partial Consent Mot. to Intervene as a Matter of Right, Nov. 5, 2025, ECF No. 10; Order, Dec. 2, 2025, ECF No. 24 (granting Colakoglu's motion to intervene). And RTAC intervened as Defendant-Intervenor. See Partial Consent Mot. to Intervene as a Matter of Right, Nov. 6, 2025, ECF No. 15; Order, Dec. 2, 2025, ECF No. 25 (granting RTAC's motion to intervene).

On May 4, 2026, Kaptan filed a motion for judgment on the agency record, followed by Colakoglu's motion for judgment on the agency record on May 11, 2026. See Pl.'s Br. at 3; Pl.-Inters.' Br. at 1. On July 6, 2026, the Government and RTAC filed response briefs to Kaptan and Colakoglu's motions. See Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. at 1, July 6, 2026, ECF No. 47 ("Gov't Br."); Rebar Trade Action Coalition's Resp. Br. at 1, July 6, 2026, ECF No.

45 ("Def.-Inter.'s Br."). On August 3, 2026, and August 10, 2026, Kaptan and Colakoglu filed their respective reply briefs. See Reply Br. for Pl. Kaptan Demir Celik Endustrisi ve Ticaret A.S., Aug. 3, 2026, ECF No. 48 ("Pl.'s Reply"); Pl.-Inters.' Reply Br. in Supp. of Their Mot. for J. on the Agency R., Aug. 10, 2026, ECF No. 49.

The court issued written questions to which the parties responded. See Qs for Oral Arg., Sep. 25, 2026, ECF No. 55; Pl. Kaptan Demir Celik Endustrisi ve Ticaret A.S. Answer to the Ct.'s Oral Arg. Qs, Oct. 9, 2026, ECF No. 58 ("Pl's OAQ Resp."); Def-Inter. Rebar Trade Action Coalition's Resp. to the Ct.'s Qs for Oral Arg, Oct. 9, 2026, ECF No. 59 ("Def.-Inter.'s OAQ Resp."); Def.'s Resp. to Oral Arg. Qs, Oct. 9, 2026, ECF No. 60 ("Def.'s OAQ Resp."). The court held oral argument on October 14, 2026. ECF No. 61. At the court's invitation, Kaptan and the Government submitted supplemental briefs following oral argument. See Pl. Kaptan Demir Celik Endustrisi ve Ticaret A.S.'s Post-Arg. Br., Oct. 23, 2026, ECF No. 65 ("Pl.'s Suppl. Br."); Def.'s Post-Oral Arg. Submission, Oct. 23, 2026, ECF No. 66. All relevant filings are now before the court.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2). The standard of review is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).

In making any determination, Commerce is required by statute to provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who

are parties to the investigation or review . . . ." 19 U.S.C. § 1677f(i)(3)(A). Commerce's explanation should account for "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (internal quotation marks and citation omitted). "[W]hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

The court will "refuse to consider" arguments challenging Commerce's determination that a party did not present to Commerce in its case brief because "a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies." Qingdao Sea-Line, 766 F.3d at 1388 (first citing 19 C.F.R. § 351.309(c)(2); and then citing Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010)). The exhaustion requirement, as set forth in 28 U.S.C. § 2637(d), embodies "congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Additionally, arguments not included in a party's opening brief are waived for purposes of the court's review. See Novosteel SA v. U.S., Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002).

## DISCUSSION

### *I. Commerce's Selection of a Land Valuation Benchmark Is Supported by Substantial Evidence and In Accordance with Law*

"Where Commerce must choose between two imperfect valuation reports, it had discretion to evaluate which report is generally more accurate . . . ." Kaptan III, 803 F. Supp. 3d at 1289–90 (first citing Timken Co. v. United States, 16 CIT 142, 147, 788 F. Supp. 1216, 1220 (1992); and

then citing Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co., 5 F.4th 1367, 1375 (Fed. Cir. 2021)). The court's role is to evaluate whether Commerce's selection is supported by substantial evidence and in accordance with law. See Borusan, 5 F.4th at 1374–1375. In making its selection, "[w]hen confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007).

In exercising its discretion, Commerce supported its selection of the Colliers report over the C&W report with substantial evidence and addressed relevant arguments made by interested parties that the data it relied upon is aberrational. The court finds Kaptan's arguments to the contrary unpersuasive and denies Kaptan's motion for judgment on the agency record.

### *A. Commerce's Selection of the Colliers Report Based on Its Preference for Independent Reports Is Supported by Substantial Evidence*

Commerce "selects a 'market-determined price for the good or service resulting from actual transactions in the country in question.' " IDM at 9 (quoting 19 C.F.R. § 351.511(a)(2)(i)). Commerce stated that it "prefers to use benchmarks from independent, third-party sources, which is why Commerce used the Colliers report for [the] benchmark." IDM at 10. Commerce cited previous administrative proceedings where it articulated a preference for independent reports, including proceedings in which Commerce "used information from Colliers International as a benchmark source . . . ." Id.[7] Commerce acknowledged Kaptan's position that "there is nothing

[7] In support, Commerce cited Certain New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Determination, 81 Fed. Reg. 39903 (Dep't Com. June 20, 2016), and accompanying preliminary decision memorandum at 32, unchanged in Countervailing Duty Investigation of Certain New Pneumatic Off-the-Road Tires from India: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part, 82 Fed. Reg. 2946 (Dep't Com. Jan. 10, 2017).

to suggest that the C&W report was prepared for the purposes of this proceeding" as "its agreement with C&W instructed C&W to provide a valuation report for internal use for Kaptan's accounts . . . ." Id. But Commerce nevertheless determined that "the C&W report . . . was prepared for the purposes of this proceeding . . . ." Id. at 9. Commerce therefore "continue[d] to find [the C&W report] incorporates a risk of litigation inspired fabrication or exaggeration" and "continue[d] to find it inappropriate to use the C&W report" to value Nur's lease. Id. at 10 (internal quotation marks and citation omitted). In contrast, Commerce determined that, "as the Colliers report is independently produced, there is not the concern that the report was biased and tailored to generate certain results for this proceeding." Id. at 11.

Kaptan does not challenge Commerce's preference to use an independent report rather than a report commissioned by an interested party as a benchmark. See Pl.'s Br. at 2 ("Kaptan agrees with Commerce and the RTAC that an independent report valuing the Nur Leasehold should be accepted over a report prepared by an interested party."). Nor does Kaptan dispute Commerce's determination that the Colliers report is "a report prepared by an independent third party." Kaptan's Case Br. at 8; see Pl.'s Br.

Kaptan instead argues that Commerce's preference for the Colliers report "is not based on any actual evidence to justify the accusation that the [C&W] [r]eport is in any way fabricated or exaggerated." Pl.'s Br. at 18. RTAC and the Government counter Commerce's did not determine that the C&W report is actually fabricated, rather "[Commerce] simply stated that the fact that [the C&W report] was commissioned for this proceeding increased [the] risk [of litigation-inspired

---

IDM at 10 n.32. Commerce also cited Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021, 88 Fed. Reg. 50103 (Dep't Com. Aug. 1, 2023) and accompanying issues and decision memorandum at Comment 12 and Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination, 72 Fed. Reg. 60642 (Dep't Com. Oct. 25, 2007). Id. at 10 n.31.

exaggeration] . . . ." Def.-Inter.'s OAQ Resp. at 3 (emphasis omitted); see also Gov't Br. at 10 ("Commerce is not, as Kaptan argues, 'accusing the internationally respected company Cushman & Wakefield of misrepresent[ation].' " (alteration in original) (quoting Pl.'s Br. at 18)).

Record evidence supports Commerce's determination that the C&W report was commissioned by Kaptan for purposes of this proceeding. The cover page of the C&W report states that the report was prepared for Kaptan. See C&W Report at 1. As noted by the Government, the C&W report was completed in June 2023, see id., "shortly before these proceedings" were initiated in December 2023 to retrospectively value the Nur leasehold in 2022. Gov't Br. at 9 (emphasis omitted) (quoting Kaptan III, 803 F. Supp. 3d at 1290). The C&W report indicates that C&W relied in part on information "received from [the] client," Kaptan, in conducting its analysis. C&W Report at 2. Additionally, Kaptan's agreement with C&W specifies that "C&W will make an Assumption that the information provided by the Client and/or its professional advisers . . . in respect of the Property to be valued is both full and correct." Engagement Agreement at 28. The C&W report's stated reliance on data provided by Kaptan supports Commerce's determination because, as the Government explains, "the report was based on data Kaptan may have changed or cherry picked and the underlying data on which the report was based are not on the record, thereby calling into question the overall reliability of the report." Gov't Br. at 10.

It is reasonably discernible that Commerce's determination was based on the contents of the C&W report and Kaptan's engagement agreement with C&W. See NMB Sing., 557 F.3d at 1319; see also Gov't OAQ Resp. at 3 (arguing that Commerce's rationale is reasonably discernible "based on Commerce's reference to the dated C&W [r]eport"). Commerce considered and rejected Kaptan's assertion that "its agreement with C&W instructed C&W to provide a valuation report

for internal use for Kaptan's accounts," which indicates that Commerce considered the contents of that agreement. See IDM at 10. Commerce further explained that its determination is consistent with prior administrative reviews. See id. at 9 n.27 (citing administrative review at issue in Kaptan III); see also Kaptan III, 803 F. Supp. 3d at 1288–91 (sustaining Commerce's determination that "the C&W report bore higher risk of litigation-inspired fabrication").

Kaptan's counterargument regarding the timing of the C&W report undermines its position. Kaptan contends that "there would be no need to determine average real estate prices in Trabzon prior to Commerce's decision to countervail the Nur Leasehold for the 2022 period of review." Pl.'s Reply at 8–9. This representation suggests that Kaptan was prompted to commission the C&W report by the administrative review in question, which is consistent with Commerce's determination that it was prepared for purposes of the proceeding. Kaptan does not present any other business justification for commissioning a report in 2023 assessing average real estate prices for the preceding year. See id; Pl.'s Br.; see also Def.-Inter.'s Br. at 13 ("[T]here is no apparent reason why Kaptan would commission [a] report[] in . . . 2023 to estimate the market rental value of Nur's . . . land in prior years, beyond use in Commerce's benchmarking exercise.").

Kaptan remaining arguments that the C&W report is reliable do not alter the analysis. Kaptan argues that the C&W report is reliable because "it is based on independent standards in the valuation industry; specifically, the RICS Valuation Standards . . . ." Pl.'s Br. at 7. The Government counters that regardless of the use of the RICS Valuation Standards, Commerce's determination was reasonable because the C&W report relied on information obtained from Kaptan. See Gov't Br. at 9–10. C&W's use of industry standard practices in preparing the report does not undermine Commerce's determination that the C&W report "was prepared for the purposes of this proceeding" or Commerce's "preference to use benchmarks from independent,

third-party sources" in exercising its discretion. IDM at 9–10.

Finally, in reply Kaptan asserts that C&W report relied on rental listings from an "official Turkish Government website" as the source of information about land value in Trabzon. See Pl.'s Reply at 8. The Government responds that Kaptan did not present this argument to Commerce and therefore failed to exhaust its administrative remedies. See Gov't OAQ Resp. at 5–7. The Government is correct; in its case brief to Commerce, Kaptan stated that "[t]he benchmark in the C&W report is the average of rental rates for 13 individual, privately-owned properties in Trabzon province[,]" but it did not argue that that the source of these rental rates was a Turkish Government website. Kaptan's Case Br. at 20. Nor did Kaptan argue that the C&W report is reliable because it used official data in its analysis. See id. Kaptan failed to administratively exhaust its argument on this point, and the court therefore declines to consider it.[8] See Boomerang Tube, 856 F.3d at 912–13; see also Tenaris Bay City, Inc. v. United States, 191 F.4th 1370, 1381 (Fed. Cir. 2026) (holding "general objections to the reliability of the sources Commerce used" did not exhaust a specific argument that the sources were flawed).

In sum, Commerce's determination that Kaptan commissioned the C&W report "for the purposes of this proceeding" is supported by substantial evidence. IDM at 9. Based on this determination, Commerce's selection of the Colliers report is consistent with its "prefer[ence] to use reports from independent, third-party sources" articulated in prior administrative proceedings. Id. at 10. As in Kaptan III, "in showing that Commerce has historically preferred to choose reports that were . . . more independent, Commerce acted reasonably in choosing the Colliers report." 803

[8] The Government also argues that Kaptan waived its argument by not including it in the opening brief. See Gov't OAQ Resp. at 5–7. And RTAC asserts that the cited website pertains only to a portion of the C&W report that is not relevant to the benchmark selection. See Def.-Inter.'s OAQ Resp. at 4. Because the court declines to consider the argument due to Kaptan's failure to exhaust its administrative remedies, the court does not consider RTAC and the Government's additional arguments.

F. Supp. 3d at 1290.

### *B. Commerce Adequately Addressed Kaptan's Arguments that Reliance on the Colliers Report is Unreasonable*

Kaptan next argues that Commerce's selection of the Colliers report is "per se unreasonable" because Commerce relied on data from the Colliers report that valued land in "the higher-developed, suburban Istanbul market of Cerkezkov, a high-rent suburb on the European side of Istanbul," and the Colliers report "does not take into account any transactions from more remote and less developed markets such as Trabzon, the location of the actual Nur Leasehold at issue." Pl.'s Br. at 13 (emphasis omitted). Kaptan repeatedly underscores that the Nur leasehold is located approximately 750 miles away from Greater Istanbul. See, e.g., id. at 10, 12–14. Kaptan argues that "property values from Greater Istanbul cannot be used as a proxy for land values 750 miles away, in the distant, rural region of Trabzon." Id. at 20.[9] Kaptan further argues that "Commerce did not sufficiently address Kaptan's argument that real estate trends in Greater Istanbul cannot be used to determine the value of land in rural Trabzon, located 750 miles away" because Commerce "refused to credit any of the data and analysis contained in the [C&W] [r]eport . . . ." Pl.'s OAQ Resp. at 2; see also Pl.'s Br. at 11 (arguing that "Commerce did not sufficiently consider Kaptan's arguments" that Commerce should use the C&W report instead of the Colliers report).[10]

---

[9] Neither the Government nor RTAC disputes Kaptan's characterization that Cerkezkoy is part of the Istanbul region, or that Trabzon is less developed and located approximately 750 miles from Istanbul. See Gov't Br. at 13; Def.-Inter.'s Br. at 7–9. Kaptan in its case brief provided maps showing the distance between Surmene, Trabzon, the site of Nur's leasehold, and Cerkezkoy, Tekirdag, near Istanbul, along with economic data for both regions. See Kaptan's Case Br. at 23–26. Commerce likewise did not dispute the accuracy of these maps or the geographic and economic information presented by Kaptan. See IDM at 9–11.

[10] In its post-argument supplemental brief, Kaptan asserts that no authority supports the conclusion "that the fact that two regions are in the same country is a sufficient basis on which to calculate a [countervailing duty] margin." Pl.'s Suppl. Br. at 3. Kaptan did not present this argument in its

In response, the Government asserts that Commerce provided a " 'reasoned explanation' as to why the data Commerce relied upon is reliable and non-distortive." Gov't Br. at 13 (quoting Mittal Steel Galati, 31 CIT at 1135, 502 F. Supp. 2d at 1308). RTAC argues that Kaptan "failed to provide evidence of the nature of such a relationship, or even its existence," and "the agency was not obliged to simply take at face value Kaptan's argument that these factors rendered reliance on the Colliers [r]eport unreasonable." Def.-Inter.'s Br. at 9–10. RTAC further contends that Kaptan's argument is flawed because it relies on data contained in the C&W report and thus "reflects a logical fallacy" because, "while a difference in the values provided by two data sets may indicate that one of the data sets is distorted, it does not indicate which one." Id. at 14.

Commerce rejected Kaptan's arguments regarding the economic and geographic differences between the location of the Nur leasehold and Greater Istanbul on the basis that "Kaptan has not provided any evidence for a quantifiable difference in these factors . . . that would indicate that the Colliers report is not comparable to [Nur's leasehold]." IDM at 10. Commerce determined that Kaptan did not place evidence on the record demonstrating that regional economic differences "have a specific effect, such as data showing a consistent increase in land values in more distant provinces, provinces with higher GDPs, provinces with high trade levels, or in areas with more developed land." Id. at 11. Commerce further explained:

> there is no quantifiable link between the presence of these factors and an effect on industrial rents. Unless such factors are adequately substantiated, Commerce cannot determine their relevance, and Kaptan has not demonstrated their proportional effect; it just supplied data indicating that there are internal differences in the Turkish economy. Thus, while each of these factors, if substantiated, are ones we would consider in determining whether to select the C&W report or the Colliers

---

opening brief to the court. See Pl.'s Br. "As a matter of litigation fairness and procedure, then, we must treat this argument as waived." Novosteel, 284 F.3d at 1274. This argument is further unavailing as the relevant regulation states that "[Commerce] will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i) (emphasis added).

> report, neither the [C&W] report nor Kaptan itself has provided any supporting evidence that these factors result in a measurable difference in comparability such that Commerce should favor the C&W report data.

Id.

Commerce's explanation here is substantially similar to the explanation the court sustained in Kaptan III following remand for further explanation. Compare IDM at 10–11, with Final Results of Redetermination Pursuant to Ct. Remand Order at 17–19, 35–36, Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, No. 23-00131 (U.S. Ct. Int'l Trade filed June 21, 2023), Jan. 21, 2025, ECF No. 53 ("Kaptan III Remand Results"). As in that case, Commerce here adequately addressed Kaptan's assertions regarding distance and regional economic differences "by showing that the record failed to make them relevant." Kaptan III, 803 F. Supp. 3d at 1289. Kaptan does not dispute the similarity of Commerce's explanation to the Kaptan III Remand Results, nor does Kaptan argue that the record evidence in this case differs from the record evidence in Kaptan III. See Pl.'s OAQ Resp. at 6.[11]

In arguing that Commerce's response is deficient, Kaptan relies on differences in average list prices between Trabzon and the Greater Istanbul area contained in the C&W report. See Pl.'s OAQ Resp. at 4 (citing C&W Report at 28). Kaptan cites its own case brief as evidence that "differences in GDP, rental rates, distance, industrialization, and other geographic and economic factors between Trabzon and Greater Istanbul account for the vast difference in land value between the two regions." Id. Kaptan's case brief, in turn, cited data on regional GDP, population growth rates, import and export data, and rental rates for unimproved industrial land calculated by the

[11] Kaptan states there is "one key difference between" the two proceedings, which relates to the year of the data underlying Kaptan's benchmark submission in each case. Pl.'s OAQ Resp. at 6. The distinction Kaptan identifies does not pertain to the existence of record evidence to support Kaptan's assertion that regional economic differences render the Colliers report unreliable. See id.

C&W report. See Kaptan's Case Br. at 24–25.

However, evidence that two regions have different GDP, rate of population growth, or level of trade does not, on its own, establish a connection between those factors and regional land values. Kaptan's assertion that generalized differences between Trabzon and [the Greater Istanbul area] "carr[y] over into every form of economic activity, including industrial rentals," is both conclusory and speculative. Id. at 26. The only evidence Kaptan offers to support its claim regarding the difference in industrial land value between Trabzon and the Greater Istanbul area is the C&W report it commissioned, which Commerce declined to rely upon for separate reasons. See Pl.'s OAQ Resp. at 4 (citing C&W Report at 28); see also Def.-Inter.'s OAQ Resp. at 2 (arguing regional differences in land values in the C&W report "could also be the result of [Kaptan] selectively presenting data for only lower-valued properties"). Kaptan therefore has not met its burden, as an interested party, "of demonstrating the impact of the factors it raises." See Kaptan III, 803 F. Supp. 3d at 1289 (citing QVD Food, 658 F.3d at 1324).

Finally, in support of its position Kaptan cites Ozdemir Boru San. ve Tic Ltd. Sti. v. United States, 41 CIT __, __, 273 F. Supp. 3d. 1225, 1249–53 (2017) and CS Wind Malaysia Sdn. Bd. v. United States, 49 CIT __, __, 2025 WL 3496986 at *5 (Dec. 5, 2025). Pl.'s Br. at 12–13. These cases fail to persuade because in each case the court remanded for Commerce to address an argument it had failed to adequately address. See Ozdemir, 273 F. Supp. 3d at 1252–53 (holding Commerce's "concise statements do not constitute a reasoned explanation . . . .");[12] CS Wind,

---

[12] Kaptan describes Ozdemir as standing for the principle that "the benchmark used by Commerce was 'distorted' and not supported by substantial evidence because it included sales of Istanbul properties in addition to properties in lesser developed regions." Pl.'s Br. at 13. Contrary to Kaptan's position, the court in Ozdemir did not hold that land valuation data from the Istanbul region may never be used as a benchmark to value property in areas outside Istanbul. See 273 F. Supp. 3d at 1250–53. Rather, the court ordered remand because Commerce failure to address a colorable claim that data was aberrational based on the record developed in that case. See id. Indeed, "the court d[id] not take issue with the Government's characterization that benchmark data

2025 WL 3496986 at *5 (holding Commerce "simply—and impermissibly—elided" the plaintiff's argument that a land valuation benchmark was not comparable "due to the disparity in real estate costs between the two Malaysian jurisdictions"). In contrast, Commerce here explained that Kaptan failed to meet its burden as Kaptan did not provide record evidence to support its contention that the information in the Colliers report is aberrational. IDM at 10–11. The court thus concludes that Commerce adequately responded to Kaptan's argument that it is unreasonable to rely on the Colliers report based on regional economic differences.

### *C. Kaptan Did Not Preserve its Remaining Arguments*

Kaptan did not preserve its remaining arguments challenging Commerce's reliance on the Colliers report. Specifically, Kaptan now argues that the Collier's report (1) is not a valuation and cannot be used to value real estate values and (2) is unreliable because it fails to disclose its underlying data and methodology. See Pl.'s Br. at 14–17. Kaptan did not present these arguments to Commerce, as required to properly exhaust its administrative remedies. See Kaptan's Case Br. at 8–27; see also Gov't Br. at 14–16 (arguing Kaptan failed to exhaust its administrative remedies); Def.-Inter.'s Br. at 10 & n.3 (same).

Kaptan argues that "Commerce is well[ ]aware of both arguments as Kaptan raised them in connection with the 2020 [administrative review] in Kaptan III and in the 2021 [administrative review in Kaptan IV]." Pl.'s OAQ Resp. at 3. This argument is unavailing because the doctrine of exhaustion requires a party to present its arguments to the agency at each stage of the proceeding. See Qingdao Sea-Line, 766 F.3d at 1388. This requirement serves to promote procedural fairness, enhance judicial efficiency, and protect the agency's interest in being the initial decisionmaker. See Dorbest, 604 F.3d at 1375; Luoyang Bearing Corp. v. United States, 44 CIT

---

need not—and rarely does—perfectly match the benefit it is used to measure." Id. at 1253 (internal quotation marks and citation omitted).

__, __, 450 F. Supp. 3d 1402, 1409 (2020), aff'd, 844 F. App'x 368 (Fed. Cir. 2021). Raising an argument in prior administrative reviews did not sufficiently appraise Commerce, or other parties to the proceeding, of Kaptan's argument here because "[e]ach administrative review is a separate exercise of Commerce's authority . . . ." Qingdao Sea-Line, 766 F.3d at 1387.

Similarly, in Mittal Steel Point Lisas Ltd. v. United States, the U.S. Court of Appeals for the Federal Circuit held the defendant-intervenor had "abandoned its argument" where the defendant-intervenor did not reiterate its position to Commerce during remand proceedings. 548 F.3d 1375, 1383 (Fed. Cir. 2008). The court rejected the defendant-intervenor's argument that "it exhausted its administrative remedies because Commerce knew [the defendant-intervenor's] position" from arguments made during the initial administrative review, explaining that "[a]t the very least, [the defendant-intervenor] should have indicated that it maintained its prior position" during the remand proceedings. Id. Here too, Kaptan failed to exhaust arguments made in previous administrative reviews that it did not present to Commerce in this administrative review. See id. The court therefore declines to consider these arguments. See Boomerang Tube, 856 F.3d at 912; 28 U.S.C. § 2637(d).[13]

Additionally, Kaptan raises new arguments in its supplemental brief filed after oral argument. See Pl.'s Suppl. Br. at 1–5. Kaptan argues that the record contains "zero evidence of the value of land in Trabzon in 2014[,]" the year Nur's rent-free lease began, and that evidence from 2022, "eight years after the relevant year, . . . do[es] not create substantial evidence of the land in question. Id. at 2. Kaptan also, for the first time, argues that Commerce's determination

[13] Relatedly, Kaptan argues that only the C&W report "even attempts to value the Nur [l]easehold," such that the Colliers report is not a reasonable selection. Pl.'s Br. at 19. Because Kaptan did not exhaust its argument that the Colliers report is not a valuation, the court declines to consider its argument that the C&W report is the only valuation available to Commerce. See Boomerang Tube, 856 F.3d at 912.

is arbitrary and capricious under the Administrative Procedure Act because "Commerce relied on the higher values contained in the 2022 Colliers [report] . . . despite claiming that 2014 is the relevant year." Id. at 4 (citing 5 U.S.C. § 706(2)(A)). Kaptan did not challenge the adequacy of the Collier's report based on timing in its case brief to Commerce or in its opening brief to the court. See Kaptan's Case Br.; Pl.'s Br. These arguments therefore are not preserved for judicial review. See Boomerang Tube, 856 F.3d at 912 (exhaustion); Novosteel, 284 F.3d at 1274 (waiver).[14]

Taken together, Kaptan has not demonstrated Commerce erred in using the Colliers report as a benchmark to value the Nur leasehold because (1) Commerce's selection of the Colliers report based on its preference to use benchmarks from independent third-party sources is supported by substantial evidence, (2) Commerce adequately responded to Kaptan's arguments challenging the reliability of the Colliers report, and (3) Kaptan's remaining arguments are not preserved for judicial review. The court therefore sustains Commerce's benchmark selection. See Borusan, 5 F.4th at 1374–1375.

### *II. There Is No Legal Basis to Recalculate the Countervailing Duty Rate Assigned to Colakoglu*

The countervailing duty rate assigned to Colakoglu as a non-selected respondent is governed by 19 U.S.C. § 1671d(c)(5)(A)(i), which states in relevant part that "the all-others [countervailing duty] rate shall be an amount equal to the weighted average countervailable subsidy rates established for exporters and producers individually investigated, excluding any zero

---

[14] Kaptan's arguments regarding the timing of the reports are further unavailing because the responsibility to create an adequate record lies with Kaptan, as an interested party, not with Commerce. See QVD Food, 658 F.3d at 1324. As Kaptan acknowledges, both the C&W report and the Colliers report are based on data from 2022. See Pl.'s OAQ Resp. at 6. Contrary to Kaptan's suggestion, Commerce was not obligated to use as a benchmark an earlier version of the Colliers report not on the record in this proceeding. See Pl.'s Suppl. Br. at 4; QVD Food, 658 F.3d at 1324.

and de minimis countervailable subsidy rates . . . ." Commerce calculated a countervailing duty rate of 2.43 percent for Kaptan and 0.04 percent for Icdas, the other mandatory respondent, which is below the de minimis threshold. See Final Results, 90 Fed. Reg. at 44168; 19 U.S.C. § 1671d(a)(3) ("[Commerce] shall disregard any countervailable subsidy that is de minimis[,]" defined by 19 U.S.C. § 1671b(b)(4) as less than one percent"). Consistent with the relevant statutes, Commerce set Colakoglu's countervailing duty rate based solely on the rate calculated for Kaptan.

Colakoglu asks the court to recalculate the rate assigned to Colakoglu as a non-selected respondent only if the court holds Commerce's calculation of the countervailing duty rate calculated for Kaptan to be unsupported by substantial evidence and not in accordance with law. See Pl.-Inters.' Br. at 5–6. Colakoglu does not otherwise claim that Commerce erred in calculating the rate assigned to non-selected respondents. See id. Because the court sustains Commerce's determination as to Kaptan, there is no basis for re-calculating the rate assigned to Colakoglu. See 19 U.S.C. § 1671d(c)(5)(A)(i). The court accordingly denies Colakoglu's motion.

**CONCLUSION**

The court denies Kaptan's motion for judgment on the agency record because Commerce's selection of a land valuation benchmark is supported by substantial evidence and in accordance with law. The court also denies Colakoglu's related request because, absent a change in the countervailing duty rate assigned to Kaptan, there is no reason to recalculate the rate assigned to non-selected respondents. Commerce's Final Results are sustained.[15]

---

[15] The parties disagree as to whether a stay of this case pending appeal of Kaptan III would be appropriate. See Pl.'s OAQ Resp. at 7 (opposing a stay because "the appeal of Kaptan III will not necessarily be outcome determinative"); Def.-Inter.'s OAQ Resp. at 7–8 (supporting a stay based on legal and factual similarities between the two cases); Gov't OAQ Resp. at 10 (deferring to the court's judgment). While the court may stay proceedings, where appropriate, pending judgment in a related case, the court declines to do so here. See Landis v. N. Am. Co., 299 U.S. 248, 254

**SO ORDERED.**

/s/ *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: November 16, 2026
New York, New York

(1936). The determinations in each case, while similar, rest on separate administrative records. See Qingdao Sea-Line, 766 F.3d at 1387. The court therefore declines to stay this case "to secure the just, speedy, and inexpensive" resolution to the action. USCIT R. 1.